**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

CLARENCE D. WILLIS,

      Plaintiff,

v.                                            Civil No. 04-CV-10241-BC

COMMISSIONER OF                  DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,                   MAGISTRATE JUDGE CHARLES E. BINDER

      Defendant;                       **CONSOLIDATED CASES**

and

CLARENCE D. WILLIS,

      Plaintiff,

v.                                            Civil No. 04-CV-10366-BC

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.
_____/


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**


**I.    RECOMMENDATION**

      In light of the entire record in this case, I suggest that substantial evidence supports the

Commissioner's determination that Plaintiff was not disabled prior to June 3, 2004.  Accordingly,

IT IS RECOMMENDED that PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE

DENIED, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED, and that

the FINDINGS OF THE COMMISSIONER BE AFFIRMED.

IT IS FURTHER RECOMMENDED that Plaintiff's Motions for Default Judgement be DENIED.

## II.   **REPORT**

### A.   **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notices of Reference, these cases[1] were referred to this Magistrate Judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability, disability insurance benefits (DIB), and supplemental security income (SSI) benefits. This matter is currently before the Court on cross motions for summary judgment and Plaintiff's motions for default judgment.

Plaintiff was 48 years of age at the time of the most recent administrative hearing and has received a GED. (Tr. at 1161, 1163.) Plaintiff's relevant work history included work as a mechanic for several different auto dealerships. (Tr. at 72-84, 1164-66.)

Plaintiff filed the instant claims on July 11, 2001, alleging that he became unable to work on December 31, 1979. (Tr. at 41-43, 1127-29.) The claims were denied at the initial stages. (Tr. at 28, 1130.) In denying Plaintiff's claims, the Defendant Commissioner considered diabetes mellitus and anxiety disorders as possible bases of disability. (*Id.*)

On June 3, 2003, Plaintiff appeared without benefit of counsel before Administrative Law Judge (ALJ) Larry Meuwissen, who considered Plaintiff's claims *de novo*. In a decision dated

---

[1]Plaintiff, acting *pro se,* filed two cases arising out of the same claims of disability. Case No. 04-CV-74779-DT was filed in the Southern Division of the Court and assigned to U.S. District Judge Robert Cleland. This case was transferred to the Northern Division of the Court, given Case Number 04-CV-10366-BC and assigned to U.S. District Judge David Lawson, who in turn issued the previously described Order of Reference to this Magistrate Judge. On July 18, 2005, I granted a motion to consolidate Case No. 04-CV-10366-BC with Case No. 04-CV-10241-BC. (Dkt. 24.)

April 22, 2004, the ALJ found that Plaintiff was not entitled to disability insurance benefits. However, as to Plaintiff's claim for SSI benefits, the ALJ determined that Plaintiff was disabled from and after June 3, 2003, the date of the administrative hearing, but not prior to that date. (Tr. at 11-21.) The ALJ therefore directed the payment of SSI benefits commencing June 3, 2003. (*Id.*) Plaintiff requested a review of this decision on April 29, 2004. (Tr. at 9.)

The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[2] (AC-1-2), the Appeals Council, on July 14, 2004, denied Plaintiff's request for review. (Tr. at 5-7.) On December 7, 2004, Plaintiff, acting *pro se,* filed suit seeking judicial review of the Commissioner's partially unfavorable decision.

### B.   Standard of Review

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam). The Commissioner is charged with finding the facts relevant to an application for disability benefits. A federal court "may not try the case de novo, . . . ." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

If supported by substantial evidence, the Commissioner's decision is conclusive, regardless of whether the court would resolve disputed issues of fact differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir.1990), and even if substantial evidence would also have supported a finding other than that made by the ALJ. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). The scope of the court's review is limited to an examination of the record only. *Brainard,* 889 F.2d at 681. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 681 (citing *Consolidated Edison Co. v. NLFB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216, 83 L. Ed. 2d 126 (1938)). The substantial evidence standard "'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts.'" *Mullen*, 800 F.2d at 545 (quoting *Baker v. Heckler*, 730 F.2d 1147, 1149 (8th Cir. 1984)) (affirming the ALJ's decision to deny benefits because, despite ambiguity in the record, substantial evidence supported the ALJ's conclusion).

The administrative law judge, upon whom the Commissioner and the reviewing court rely for fact finding, need not respond in his or her decision to every item raised, but need only write to support his or her decision. *Newton v. Sec'y of Health & Human Servs.*, No. 91-6474, 1992 WL 162557 (6th Cir. July 13, 1992). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987) (ALJ

4

need only articulate his rationale sufficiently to allow meaningful review).  Significantly, under this standard, a reviewing court is not to resolve conflicts in the evidence and may not decide questions of credibility.  *Garner,* 745 F.2d at 387-88.

### C.    Governing Law

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious.  *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen*, 800 F.2d at 537.

The "[c]laimant bears the burden of proving his entitlement to benefits."  *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994).  "[B]enefits are available only to those individuals who can establish 'disability' within the terms of the Social Security Act."  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  One is thus under a disability "only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

There are several benefits programs under the Act, including the Disability Insurance Benefits Program of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program of Title XVI (42 U.S.C. §§ 1381 *et seq.*)  Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, <u>Federal Disability Law and Practice</u> § 1.1 (1984).  While the two programs have difference eligibility requirements, both require a finding of disability for the award of benefits.

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, benefits are denied without further analysis.
>
> Step Three:  If the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled without further analysis.
>
> Step Four:  If the claimant is able to perform his or her previous work, benefits are denied without further analysis.
>
> Step Five:  If the claimant is able to perform other work in the national economy, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920.  *See also Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 554 n.2 (6th Cir. 1995); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 687-88 (6th Cir. 1985).  "The burden of proof is on the claimant

throughout the first four steps of this process to prove that he is disabled." *Preslar*, 14 F.3d at 1110. "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Id.* "Step five requires the [Commissioner] to show that the claimant is able to do other work available in the national economy. . . ." *Id.*

### D.   Administrative Record

A review of the medical evidence contained in the administrative record and presented to the ALJ indicates that Plaintiff has a nearly 30-year history of medical treatment at Veterans Administration Medical Centers and that he suffered with a long history of diabetes.

In mid-March 1980, Plaintiff was admitted to the Veterans Administration (VA) Hospital in Allen Park, Michigan, complaining of pain and vomiting. He was diagnosed with diabetes, a personality disorder, and a urinary tract infection. (Tr. at 296.) Plaintiff was given insulin and intervenous medications. Chest and abdominal x-rays were normal, and an electrocardiogram was within normal limits upon admission. (Tr. at 297.) Plaintiff's diabetes was under control within the first 24 hours of medication, however, "there was much difficulty on glucose control secondary to the patient's non-compliance[.]" (*Id.*) Plaintiff's treating physicians stated that Plaintiff left the hospital without approval on a daily basis to use marijuana and buy food. While given a weekend pass, Plaintiff was apprehended for traffic violations and returned to the hospital. Plaintiff also brought illegal controlled substances into the hospital and ultimately signed himself out against medical advice. Plaintiff undertook a three hour walk to his home. (Tr. at 298.)

In late August 1984, Plaintiff was admitted to the VA Hospital in Allen Park for treatment of uncontrolled diabetes. The admitting physician noted that Plaintiff had "a long history of non-compliance with his insulin and also non-compliance with his diet." (Tr. at 289.) Although he denied it, Plaintiff's physician also noted that Plaintiff "has a long history of IV drug abuse[.]" (*Id.*)

X-rays showed no evidence of cardiac irregularities. (Tr. at 290.) Plaintiff's blood sugar was brought under control, and he was discharged two weeks after admission. (*Id.*).

On February 8, 1987, Plaintiff was admitted to Pontiac Osteopathic Hospital due to an acute insulin reaction. Plaintiff reported having had a history of type I diabetes for the past 11 years and that he had been hospitalized before for diabetes. He reported having smoked ½ to 1 pack of cigarettes a day for several years, and that he used alcohol at least once every two weeks. He also reported a history of marijuana and cocaine use for two years. (Tr. at 475.) After monitoring Plaintiff and administering medications, he was discharged six days later with a diagnosis of uncontrolled diabetes mellitus and severe hypoglycemia due to insulin reaction. He was instructed to control his diet and follow up with his doctor. (Tr. at 483.)

On September 3, 1987, Plaintiff was admitted to Pontiac Osteopathic Hospital with an acute insulin reaction. At that time, Plaintiff reported that he smoked a pack of cigarettes a day and that he used alcohol at least once a week. (Tr. at 457.) Plaintiff stated that he had a chronic cough, weakness, fatigue, appetite change, sleep change, chills, fevers and night sweats. (Tr. at 458.) A chest x-ray was negative. (Tr. at 519.) Plaintiff was discharged three days later in stable condition with a diagnosis of acute insulin shock and uncontrolled diabetes mellitus. (Tr. at 463.)

In early May 1994, Plaintiff was admitted to the Huron Valley Hospital emergency room after having been involved in an auto accident. (Tr. at 1083.) Initial testing showed that Plaintiff's blood sugar was extremely low. Although Plaintiff complained of pain in his shoulders, he exhibited full range of motion. (*Id.*) A CT scan of the head was negative, as was an electrocardiogram. (Tr. at 1083-84.) X-rays of the cervical spine, chest and both shoulders were normal. The emergency room physician felt that Plaintiff's insulin needed to be adjusted. While the previously described x-rays were being reviewed, Plaintiff became "quite agitated and was

8

yelling in the emergency department." (Tr. at 1084.)  Plaintiff left the hospital prior to receiving written follow-up instructions from the doctor.  (*Id.*)

Plaintiff was also admitted to hospitals in the Pontiac area in October 1990 (Tr. at 554), December 1990 (Tr. at 521, 560), and January 1995 (Tr. at 569).[3]  Electrocardiograms and x-rays taken during these hospitalizations were normal.  (Tr. at 527, 550, 556, 566, 567, 574.)  During one of these hospitalizations, it was noted that Plaintiff had sustained a collapsed lung from an altercation in 1979.  (Tr. at 546.)

On May 28, 1995, Plaintiff was seen at the MidMichigan Regional Medical Center - Clare emergency room for chest and back pain.  He reported being in an automobile accident five days earlier due to an insulin reaction.  (Tr. at 119.)  He had several broken ribs and was suffering with chest and back pain since the accident.  A chest examination revealed bilateral rhonchi with scattered wheezes, and the chest wall was severely tender to palpation.  (Tr. at 120.)  Plaintiff was diagnosed with acute exacerbation of pneumonia, acute chest contusion, and uncontrolled diabetes. He was admitted to the hospital.  (*Id.*)  Upon admission, it was noted that Plaintiff had been coughing up blood clots which at times were black in color.  Plaintiff denied shortness of breath or any other cardiac symptoms.  The doctor stated that Plaintiff was not compliant with his insulin therapy.  A chest x-ray was negative, and the doctor did not feel that Plaintiff had pneumonia.  (Tr. at 121-22.)  Plaintiff was discharged two days later with medication.  (Tr. at 123.)

X-rays of Plaintiff's chest in early March 1996 were characterized as "unremarkable."  (Tr. at 292.)  Plaintiff was also seen at the VA Hospital in early March for complaints of back pain and dizziness.  Plaintiff received prescription medication and was discharged with notations that he could walk without assistance.  (Tr. at 277-79.)

---

[3]The medical records of these hospital admissions are largely illegible.

9

In late May 1996, Plaintiff was seen at the VA Hospital in Saginaw, Michigan, for complaints of sinus headache and sore throat. (Tr. at 268.) X-rays of Plaintiff's hips, hands, wrists, knees, and chest were considered normal, and an upper GI taken the same day showed no evidence of stomach ulcer and minimal gastroesophageal abnormalities. (Tr. at 272-76.)

In mid-September 1996, Plaintiff underwent fundoscopic examination of his esophagus and stomach. (Tr. at 260-63.) The results were considered normal. (Tr. at 258, 262.)

X-rays of Plaintiff's shoulders taken in late January 1997 were "unremarkable." (Tr. at 1041.) X-rays of Plaintiff's chest and rib cage taken in late April 1997 were negative (Tr. at 1039-1040.) In May 1997, Plaintiff received cortisone injections in each knee to reduce swelling. (Tr. at 287.)

In late July 1997, Plaintiff was seen at the VA Hospital in Allen Park for evaluation of his diabetes, as well as complaints of joint pain. Examination revealed tenderness in the lower back and some limitation in range of motion. (Tr. at 245.) Straight leg raising tests could be accomplished to 90 degrees with both legs. Plaintiff reported pain in movement of the shoulders, and some limitations of motion were seen. Plaintiff was able to walk normally, squat 50% of normal, and was able to get on and off the examining couch without difficulty. The doctor felt that Plaintiff "had some functional limitations such as inability to squat more than 50%." (*Id.*) Plaintiff's diabetes was considered under poor control at that time, although no evidence of peripheral neuropathy or other effects were seen. (*Id.*) X-rays of Plaintiff's chest, shoulders, lower back and knees showed minimal arthritic changes in the lumbosacral spine but were otherwise normal. (Tr. at 249, 251-53.) X-ray examination of Plaintiff's stomach indicated a "tiny" ulcer and a small hernia. (Tr. at 250.)

In early August 1997, Plaintiff underwent a mental examination at the Detroit VA Hospital. The doctor felt that Plaintiff's affect was flat and that his speech was rather slow, however, Plaintiff was sociable and "very competent as far as discharging his parental responsibilities." (Tr. at 239.) Plaintiff related that he got along fairly well with his neighbors, and the doctor characterized Plaintiff's thinking to be "fairly realistic and there were no unusual thought content, obsessions or psychotic manifestations present." (Tr. at 240.) The doctor noted that Plaintiff undertook house work and that "he does drive and he is active physically." (Tr. 239.) Plaintiff was described as alert, and no gross interference with his consciousness was seen. Plaintiff was described as well oriented and well informed. The doctor diagnosed a somatoform[4] pain disorder, a history of multi-substance abuse in remission, chronic misuse of alcohol, and a mixed personality disorder. The doctor assessed a GAF[5] score of 75 with the notation that he felt Plaintiff was competent to handle his personal and financial affairs. (Tr. at 241.)

---

[4]Somatoform pain disorder is defined as "a mental disorder the principal feature of which is a complaint of severe chronic pain that cannot be explained by known pathologic-physiologic mechanisms. In addition, there are signs indicating a psychological origin of the symptoms." 5 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE S-205

[5]"Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact and in predicting outcome. The reporting of overall [psychological, social, and occupational] functioning on Axis V can be done using the Global Assessment of Functioning (GAF) Scale." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000). A GAF Scale of 70 to 61 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships; a scale of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with co-workers); a scale of 41-50 indicates serious symptoms e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job); a scale of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). On this basis, I suggest that a GAF score greater than 70 indicates the presence of no psychological or psychiatric symptoms.

On March 11, 1998, Plaintiff reported to his treating psychologist that his medications were helpful, and he did not mention side effects. (Tr. at 900.) He told his treating psychologist that he spent considerable time fishing. (Tr. at 927.) On May 4, 1998, Plaintiff was seen again by his treating psychologist. Although Plaintiff appeared "somewhat depressed" and "stressed," the doctor stated that Plaintiff felt that his antidepressant medication was "helpful." (Tr. at 898.)

In early May 1998, Plaintiff was admitted to the Pontiac Osteopathic Hospital emergency room after suffering head injuries in an altercation. (Tr. at 418.) A CT scan of the head was negative, and neurological examination was found to be normal. (Tr. at 420, 432.) The attending physicians were required to place Plaintiff in restraints as he was unwilling to cooperate with them. (Tr. at 418.) Plaintiff was discharged in stable condition the next day. (Tr. at 424.)

In mid-November 1998, Plaintiff was seen at the Ann Arbor VA Hospital for complaints of joint pain. (Tr. at 226.) The examining physician noted that recent x-rays were either normal or showed minimal degenerative changes. Examination of Plaintiff's knees revealed "some slight medial lateral instability." (*Id*.) Other orthopedic tests were negative. The doctor continued Plaintiff's pain medication, instructed him as to exercises, and ordered flexible knee braces for his use. X-rays of Plaintiff's right foot showed a broken bone in the 5th toe which was healing. (Tr. at 940.) Chest x-rays were negative. (Tr. at 941.) A progress note prepared in late November 1998 indicated that Plaintiff felt less depressed and under less stress. (Tr. at 225.)

In mid-December 1998, Plaintiff was seen at the Saginaw VA Hospital for follow-up care on his diabetes. Blood tests revealed normal thyroid and electrolytes but slightly elevated blood sugar. (Tr. at 221.) The examining physician instructed Plaintiff relating to diet and adjustment of his insulin medication. (*Id*.)

In mid-January 1999, Plaintiff reported that the pain in his knee was "significantly improved with the quadriceps exercises and the knee brace," which he wore as needed.  (Tr. at 219.)  Examination of the back revealed full lumbosacral range of motion.  (*Id*.)  Straight leg raising and other orthopedic tests were negative.  The doctor encouraged Plaintiff to undertake aerobic exercise.  On the same date, Plaintiff saw a psychologist, informing him that "depression had not been a problem." (Tr. at 220.)  The psychologist noted that Plaintiff did not manifest any thoughts or intention of self harm.  (*Id*.)  Blood tests taken at the Saginaw VA Hospital in early February 1999 showed improvement over previous tests.  (Tr. at 218.)

In mid-February 1999, Plaintiff underwent a physical examination at the Allen Park VA Hospital.  Examination of the spine revealed some loss of normal curvature and limitations in rotation.  (Tr. at 212.)  Plaintiff's legs showed no neurological deficiencies.  Straight leg raising tests were positive at 45 degrees, but other orthopedic tests were normal.  Plaintiff's hips showed some limitations in range of motion.  The ligaments of Plaintiff's knees were described as stable, and alignment was normal without deformity.  (*Id*.)  X-rays of the lumbar spine, both hips, both knees, and both shoulders were all within normal limits, and "there [was] no evidence of arthritis or any other traumatic pathology." (*Id*.)  An upper GI x-ray examination of Plaintiff's stomach was normal with minimal thickening of some tissues and no evidence of ulcers.  An electrocardiogram taken in early March 1999 was normal.  (Tr. at 206.)  Nerve conduction studies taken the same month were also considered "essentially normal." (Tr. at 203.)  X-rays of Plaintiff's shoulders suggested the possibility of a rotator cuff tear in the left shoulder.  (Tr. at 982.)

In late March 1999, Plaintiff underwent a psychological examination conducted at the Allen Park VA Hospital.  Plaintiff recounted that he was "able to function in his home and take care of

his various responsibilities, including driving his children to and from school. He also does the household chores while his wife works." (Tr. at 200.) According to the examining physician, Plaintiff exhibited no evidence of hallucinations or paranoid or delusional beliefs. (Tr. at 200-01.) The doctor diagnosed dysthymia and an adjustment disorder with mixed anxiety and depression. (Tr. at 201.) His GAF score was assessed at 65. (*Id.*) On April 7, 1999, Plaintiff recounted that he felt that his medications were helpful. (Tr. at 188.)

On June 22, 1999, Plaintiff saw his treating psychologist at the Saginaw VA Hospital, who stated that Plaintiff "appeared less depressed." (Tr at 182.) Blood tests taken in early July 1999 at the Saginaw VA Hospital were normal with the exception of increased cholesterol. (Tr. at 178.)

In mid-July 1999, Plaintiff received a nerve block injection at the Saginaw VA Hospital. Plaintiff stated that he "received good relief from the block initially." (Tr. at 173-75.) In late July 1999, Plaintiff was seen at the urgent care department of the Saginaw VA Hospital complaining of pain in his side in the area of the earlier nerve block injections. (Tr. at 170.) Chest x-rays were negative. Plaintiff received antibiotics and was discharged in stable condition.

On August 20, 1999, Plaintiff was seen by a psychologist at the Saginaw VA Hospital. He reported that Plaintiff reported "some mild depression on occasion. Not depressed today." (Tr. at 783.)

On October 13, 1999, Plaintiff was again taken to the emergency room at the Mid-Michigan Medical center with an acute insulin reaction with hypoglycemia. Plaintiff reported that he wasn't eating properly and had passed out. The problem was resolved with food and medication. (Tr. at 114.)

X-rays of Plaintiff's cervical spine taken September 21, 2000, were normal. (Tr. at 938.) Chest x-rays taken the same day were also normal. (*Id.*) On various dates in 2000, Plaintiff was

encouraged to eat regular meals to help control his diabetes.  (Tr. at 149-56.)  In early December 2000, Plaintiff received another nerve block treatment.  (Tr. at 148.)

X-rays of Plaintiff's spine in early March 2001 showed an "adequate" spinal canal and "unremarkable" intervertebral facet joints, along with some "minor" bone spur formation in the lower back. (Tr. at 937.) Examination notes in mid-March 2001 state that with regard to Plaintiff's diabetes, "he has some neurological problems, but they are relatively minimal considering the severity of his diabetes."  (Tr. at 145.)  Plaintiff received another nerve block treatment in early April 2001.  (Tr. at 140.)

In late April 2001, Plaintiff was seen for a neurological examination at the Saginaw VA Hospital.  The doctor noted multiple trigger points of tenderness in the arms, legs, back and neck. (Tr. at 138.)  Some decrease in sensation was also seen.  Plaintiff's gait was described as normal. (*Id*.)  Between April and June 2001, Plaintiff underwent sympathetic nerve block injections conducted at the Saginaw VA Hospital.  (Tr. at 644, 659.)

In late July 2001, Plaintiff was seen at the Saginaw VA Hospital for pain and swelling in the right foot after he fell and caught his foot on the edge of a cabinet.  (Tr. at 130.)  X-rays revealed fractures in three of Plaintiff's toes.  (Tr. at 131.)  Plaintiff thereafter underwent orthopedic surgery. (Tr. at 128-29.) In late August 2001, Plaintiff underwent gallbladder removal surgery.  (Tr. at 932-33.)  Plaintiff was also seen for physical therapy subsequent to the right foot injury.  (Tr. at 978.)

In an activities summary completed in late August 2001, Plaintiff reported that he sometimes fixed his meals and cooked meals with his wife.  (Tr. at 88.)  Plaintiff recounted that he mopped floors, washed dishes, vacuumed, and could undertake home repairs.  (Tr. at 89.) Plaintiff sometimes worked with his wife and at other times with his children.  Plaintiff recounted

that he shopped twice a month for food and clothing with his wife at stores in Harrison and Mt. Pleasant, with his wife driving most of the time. (*Id.*) Plaintiff stated that he enjoyed reading the Bible, newspapers and novels, and he also enjoyed watching movies and television. (Tr. at 90.) Plaintiff stated that he enjoyed hunting and fishing and had previously enjoyed swimming. He also stated that he went squirrel hunting every day during the hunting season when he was not scheduled for a medical appointment. (*Id.*) Plaintiff stated that he could no longer deer hunt using bow and arrow and that using a shotgun was difficult. Plaintiff visited with his friends two to three times a week and also visited with family members. (Tr. at 90-91.) He stated that he attended church regularly. (*Id.*)

On September 6, 2001, Plaintiff's treating psychologist reported that Plaintiff's mood and affect were somewhat depressed. (Tr. at 911.) Plaintiff recounted problems with his wife and children. The doctor reported that Plaintiff maintained interests and activities and "spent the night hunting coyotes." (*Id.*)

Plaintiff was seen by Dr. R. Scott Lazzara, M.D., at the request of the Disability Determination Service on August 8, 2001. Plaintiff's main complaints were diabetes and depression. Plaintiff reported having had paramedics come to his house many times for hypoglycemic episodes. (Tr. at 383.) Plaintiff had no difficulty getting on and off the examining table but was unable to heel and toe walk, squat, or hop due to a cast on his leg. Straight leg raising was negative, and he had full fist and grip strength. (Tr. at 384.) The doctor's conclusion was that of a prolonged history of insulin dependent diabetes. The doctor stated that Plaintiff was noncompliant with his diabetes problem. Upon examination, Plaintiff showed evidence of retinopathy. He was able to perform fine motor movements but was not able to do orthopedic maneuvers because of a cast on his right lower leg due to a fractured tibia/fibula. The doctor noted

16

that Plaintiff had a history of low back pain and depression and that an evaluation by a psychiatrist would also be appropriate.  (Tr. at 385.)

In a letter to the Disability Determination Service, dated October 4, 2001, Psychologist Mark Deskovitz reported that he had evaluated Plaintiff.  Plaintiff told him that he had been suffering with diabetes for 22 years and that he had degenerative arthritis, glaucoma and depression.  He stated that he had been unable to work since 1995.  (Tr. at 353.)  Plaintiff reported a history of alcohol problems and drug problems, and that he had been arrested several times.  He reported that he did not get along very well with his family and that he would often go overnight to a friend's house in order to get away from them.  During the evaluation, Plaintiff appeared to have trouble breathing and would cough frequently and bring up phlegm.  His hands also appeared to shake uncontrollably during the evaluation.   (Tr. at 355.)   Plaintiff was diagnosed with dysthymic disorder, alcohol abuse in remission, glaucoma, diabetes, neuropathy, degenerative arthritis, and had a GAF[6] score of 64.  (Tr. at 357.)

Plaintiff was referred again to Dr. Lazzara for medical evaluation on December 12, 2001. Plaintiff's main complaints at that time were diabetes and depression.  Plaintiff told the doctor that he could sit for 30 minutes, stand for 30 to 60 minutes, and walk about 100 feet.  (Tr. at 377.) Plaintiff had some difficulty getting on and off the examination table, mild difficulty heel and toe walking, and severe difficulty squatting.  He was unable to hop due to pain.  Plaintiff had paravertebral muscle spasm in the neck and lumbosacral area.  (Tr. at 380.)  Plaintiff could bend

---

[6]"Axis V is for reporting the clinician's judgment of the individual's overall level of functioning.  This information is useful in planning treatment and measuring its impact and in predicting outcome.  The reporting of overall [psychological, social, and occupational] functioning on Axis V can be done using the Global Assessment of Functioning (GAF) Scale."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).  A GAF Scale of 70 to 61 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

forward 40 of the normal 90 degrees, extend and flex his back 20 of the normal 30 degrees, and rotate 10 of the normal 30 degrees. (Tr. at 378.) Range of motion in the shoulders was somewhat limited (Tr. at 379), but range of motion in the hips, knees, ankles and wrists was found to be normal. (*Id*.) Straight leg raising tests were negative. Plaintiff exhibited full grip strength in each hand and could pick up a coin, open the door, and fasten buttons. (Tr. at 380.) Muscle strength was somewhat reduced in the right arm, but sensory function remained intact. (*Id*.) The doctor's conclusions were diabetes and degenerative arthropathy. Upon examination, Plaintiff had evidence of retinopathy and peripheral vascular disease. The doctor stated that Plaintiff was not following a diabetic diet and was not being monitored. Plaintiff had diminished range of motion in his back, neck and shoulders. (Tr. at 381.) X-rays of Plaintiff's shoulders, hips, lumbar spine and knees were considered by the reviewing physician to be essentially normal. (Tr. at 382.)

In late January 2002, Plaintiff was seen by his treating psychologist. Plaintiff told the psychologist that he seldom checked his blood sugar level. (Tr. at 1100.) Plaintiff was receiving psychiatric services but was ambivalent concerning the effectiveness of medications he had been prescribed. (*Id*.) The psychologist described Plaintiff's affect as constricted, and his mood appeared somewhat depressed, although Plaintiff did not manifest any thoughts or homicidal ideations.

In late January 2002, Plaintiff was also seen by physicians at the Saginaw VA Hospital neurology clinic. (Tr. at 1101.) The examining physician found that Plaintiff had some tremor in his movements although there was no evidence of abnormal limping, and Plaintiff's gait was normal. (*Id*.) Plaintiff's medications were adjusted at that time.

In early February 2002, Plaintiff was seen by physicians at the VA Hospital in Saginaw. (Tr. at 1096.) The doctor reported that Plaintiff's heart rate and rhythm were within normal limits.

(*Id.*)  Plaintiff's extremities were within normal limits, and only "minimal" changes were seen in his feet and legs.

### E.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability.  (Tr. at 20.)  At step two, the ALJ found that Plaintiff's diabetes mellitus and depression were "severe" within the meaning of the second sequential step.  (*Id.*)   At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations.  (*Id.*)  At step four, the ALJ found that Plaintiff could not perform his past relevant work.  (*Id.*)  At step five, Plaintiff was found not eligible for disability benefits, but was found disabled as of June 3, 2003, and eligible for SSI benefits.  (Tr. at 21.)

### F.    Analysis and Conclusions

### 1.    Disability Claim

#### a.    Legal Standards

The ALJ determined that Plaintiff possessed the residual functional capacity to return to a "wide range" of sedentary work.  (Tr. at 21.)

> Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a) (1991).  Social Security Ruling (SSR) 83-10 clarifies this definition and provides that:

> "Occasionally" means occurring from very little up to one-third of the time.  Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of

an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.  Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim.  I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

### b.    Substantial Evidence

Plaintiff in essence seeks a closed period of disability benefits running from December 31, 1979, the disability onset date alleged in his applications, to June 2, 2003, the date the ALJ found him disabled, and thus eligible for SSI benefits.  Put another way, Plaintiff is arguing that substantial evidence fails to support the findings of the Commissioner, and that he was disabled earlier than the date found by the ALJ.  In this circuit, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *Mullen,* 800 F.2d at 545.  In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

As to Plaintiff's claims of disabling physical impairments, I suggest that substantial evidence supports the findings of the ALJ.  The most recent medical evidence I have been able to find in this voluminous record indicates that Plaintiff's treating physicians found Plaintiff's extremities within normal limits and exhibiting only "minimal" changes. (Tr. at 197.) Straight leg testing on more than one occasion was found to be normal. (Tr. at 219,245, 379, 384.) Nerve conduction studies were normal. (Tr. at 203.)  X-ray examinations were repeatedly described as normal. (Tr. at 183-184, 249, 251-253, 292, 382, 937, 938, 941, 1039, 1041.)

In an activities summary, Plaintiff recounted that he undertook housework, shopping, and went hunting on every opportunity available to him.  (Tr. at 88-91, 911.)  Plaintiff's treating psychologist noted that Plaintiff was "very competent in discharging his parental responsibilities." (Tr. at 239; *see also* Tr. at 200.)   Plaintiff was "active physically" (Tr. at 234) and spent considerable time fishing.  (Tr. at 927.)   As correctly noted by the ALJ, these activities are inconsistent with the definition of disability laid out by Congress in the Social Security Act, 42 U.S.C. § 423(d)(1)(A), and the Commissioner's regulations, 20 C.F.R. §§ 404.1520 and 416.920. (Tr. at 19.)

As to Plaintiff's claims of disabling mental impairments, the evidence in this case falls considerably short of that found in this circuit sufficient to uphold a finding of disability. *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260 (6th Cir. 1988); *Lankford v. Sullivan*, 942 F.2d 301 (6th Cir. 1991); *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1068 (6th Cir. 1992).   I suggest, instead, that the administrative record in this case is much more consistent with those cases in this circuit finding that allegations of disabling mental impairments failed to justify the award of benefits.  *Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988); *Vaughn v. Sec'y of Health & Human Servs.*, No. 89-2259, 1990 WL 120967 (6th Cir. Mich. August 21, 1990); *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 150 (6th Cir. 1990); *Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1992).   In addition, there is in this record no indication that mental impairments rendered Plaintiff with "no useful ability to follow work rules, deal with the public, interact with supervisors, cope with work stress or relate predictably in social situations[,]" as was the case in *Walker*, 980 F.2d at 1068.  Although Plaintiff underwent a series of psychological evaluations at VA facilities, none of those evaluations yielded a GAF score indicating more than only "mild" symptoms.  (Tr. at 201, 241, 357.)

The medical evidence contained in the administrative record also indicates that on numerous occasions, Plaintiff failed to follow the directives of his treating physicians, particularly regarding the treatment of his diabetes.  (Tr. at 114, 121-22, 197, 183-84, 289, 298, 384-85, 418.)  In this circuit, it is well-settled that "[a]n impairment that can be remedied by treatment will not serve as a basis for a finding of disability."  *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).  The Commissioner's regulations provide for a denial of benefits where a claimant fails to follow prescribed treatment.  *Young v. Califano*, 633, F.2d 469, 472-73 (6th Cir. 1980).  Similarly, it has been held in this district that the failure to follow a prescribed course of treatment which could restore the ability to work is a proper ground for the denial of benefits.  *Hamilton v. Sec'y of Health & Human Servs.*, No. 91-CV-73589, 1992 WL 346304 (E.D. Mich. August 25, 2992) (Rosen, J.).

The ALJ also found complaints of disabling pain not fully credible.  Social Security regulations prescribe a two-step process for evaluating subjective complaints of pain.  The plaintiff must establish an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition, or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.  20 C.F.R. § 404.1529(b) (1995); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms.  20 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70.  In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses

to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*

In the present case, the ALJ acknowledged that Plaintiff had an impairment that could cause pain; however, he found that the severe and debilitating nature of Plaintiff's alleged pain was not fully credible and provided reasons for this conclusion. The issue is whether the ALJ's credibility determinations are supported by substantial evidence. An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Under this standard, I suggest that there is insufficient basis on this record to overturn the ALJ's credibility determination. For all these reasons, I suggest that Plaintiff has failed to establish his burden of establishing disability prior to June 2, 2003.

Plaintiff also attaches to his filings a number of documents not part of the administrative record, which he presumably requests the court to consider. Although sentence six of 42 U.S.C. § 405(g) authorizes the court to remand a case for additional administrative action to consider new evidence, before such a remand can be ordered, the new evidence must be material, and good cause must be shown for the failure to submit the new evidence during the administrative proceedings. The party seeking the remand has the burden of proving both the materiality of the new evidence and a valid reason for the failure to obtain the evidence prior to the administrative hearing. *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir.1984); *see also Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir.1993). In order for the claimant to satisfy this burden of proof as to materiality, he or she must also demonstrate that there was a reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with

23

the new evidence. *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir.1980). Plaintiff, I suggest, has failed to meet these requirements.

### 2.    Motions for Default Judgment

Plaintiff moves for default judgment against the Commissioner, arguing that the Commissioner's response to his complaint has been late filed.[7] Rule 55(e) of the Federal Rules of Civil Procedure governs, I suggest, the determination of this motion and states:

> **(e) Judgment Against the United States.** No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court.

Because I have suggested above that substantial evidence supports the findings of the ALJ, I conclude that Plaintiff has failed to "establish [. . .] a claim or right to relief " within the meaning of this rule and that, therefore, the denial of Plaintiff's request for default judgment is appropriate. *See Poe v. Mathews*, 572 F.2d 137, 138 (6th Cir. 1978).

### 3.    Conclusion

After review of the record, I conclude that the decision of ALJ Meuwissen, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Mullen*, 800 F.2d at 545, as the decision is supported by substantial evidence. I therefore suggest that the Defendant's motion for summary judgment be granted, the Plaintiff's motion be denied, and the findings of the Commissioner be affirmed. I further suggest that Plaintiff's motions for default judgment be denied.

---

[7]In these motions, the *pro se* Plaintiff raises numerous additional issues over which this Court has no jurisdiction. As pointed out above, review is limited to the administrative record presented to and reviewed by the ALJ. *Cotton*, 2 F.3d at 696.

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n. of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ *Charles E. Binder*

CHARLES E. BINDER
Dated: October 31, 2005                                United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Janet Parker, and served in the traditional manner on Clarence Willis and Honorable David M. Lawson.

Dated:  October 31, 2005                           By     s/Mary E. Dobbick
                                                                     Secretary to Magistrate Judge Binder